IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

MALCOLM K.H. LEE, SR.,                )      CIV. NO. 09-00032 SOM/KSC
                                      )
          Plaintiff,                  )
                                      )
     vs.                              )      ORDER GRANTING DEFENDANT'S
                                      )      MOTION FOR SUMMARY JUDGMENT
STATE OF HAWAII, DEPARTMENT           )
OF PUBLIC SAFETY; DOE                 )
INDIVIDUALS 1-10; DOE                 )
ENTITIES 1-10;                        )
                                      )
          Defendants.                 )
_____       )


ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.        INTRODUCTION.

          Plaintiff Malcolm K.H. Lee, Sr., is a prison guard

with the rank of Captain at the Women's Community Correctional

Center ("WCCC") in Kailua, Hawaii.  He argues that his employer,

the State of Hawaii's Department of Public Safety, retaliated

against him in response to complaints he filed with the Equal

Employment Opportunity Commission and to his open opposition to

persons nominated to be the DPS Director.  He complains that the

retaliation took the form of protracted administrative

investigations of him, of passing over him for the position of

Managing Adult Corrections Officer, and of reassignment to a

position with lesser duties.  Lee alleges violations of Title VII

and the First Amendment.  The DPS moves for summary judgment,

arguing that Lee has failed to establish such claims.  For the

reasons set forth below, the court GRANTS the DPS motion.

II.        BACKGROUND.

Lee has served in various capacities as an Adult Corrections Officer for 37 years.  Lee Decl. ¶¶ 3-9, attached to Pl.'s Concise Statement.  He is now a Captain/Chief of Security at WCCC.  Id. ¶ 8; Yamamoto Decl. ¶ 4, attached to Def.'s Motion.

In November 2006, Iwalani White, at the time the interim DPS Director, was told that Lee and several other Adult Corrections Officers had mishandled construction materials and equipment from WCCC.  Ex. D, attached to Def.'s Motion.  A WCCC laundry worker complained that the ACOs had bought generators, a lawn mulcher, chain link fencing, and other items without proper authorization.  Ex. D-1, attached to Def.'s Motion.  The laundry worker also complained that the ACOs had taken equipment, such as chain saws and a sound system, without authorization.  Id.

Lee was among six ACOs placed on leave pending an investigation.  Id.  While some of the ACOs were put on leave without pay for roughly a week during the initial investigation, that apparently did not happen to Lee because he happened to be on sick leave when the investigation began.  Id.  Compare Ex. D-4, attached to Def.'s Motion (noting that Lee and the five ACOs were suspended for thirty days without pay) with Ex. C, attached to Def.'s Motion (noting that Lee was not placed on leave without pay because he was on sick leave).  It is not clear from the

2

record before the court whether Lee's sick leave continued for the entire period the other ACOs were on leave without pay.

Because the allegations were criminal in nature, White referred the matter to the State of Hawaii's Attorney General for investigation.  Ex. D-3, attached to Def.'s Motion.  The criminal investigation, which lasted about a month, concluded that there was insufficient evidence to establish criminal activity. Yamamoto Decl. ¶ 6, attached to Def.'s Motion.

The DPS conducted its own administrative investigation, apparently beginning in November 2006 and concluding in the summer of 2009.  See Ex. F, attached to Def.'s Motion (returning Lee to WCCC effective July 1, 2009); Exs. H & F, attached to Pl.'s Concise Statement (predisciplinary due process hearings resulted in no disciplinary action).  The DPS investigation, broader in scope than the criminal investigation, focused on alleged mismanagement, favoritism, and misuse of funding.  Ex. D-4, attached to Def.'s Motion; Yamamoto Decl. ¶¶ 5, 7.  This investigation examined not only the ACOs, but also seven or eight managers.

On February 5, 2007, Lee was reassigned to the Oahu Community Correctional Center ("OCCC") for the duration of the investigation.  Ex. E, attached to Def.'s Motion.  Lee alleges that at OCCC he was assigned miscellaneous duties involving less authority than he had had at WCCC.  Lee Decl. ¶ 18.

In March 2007, while the administrative investigation was in progress, the state Senate held confirmation hearings for Iwalani White, Governor Linda Lingle's nominee to be the DPS Director.  In written and oral testimony opposing White's confirmation, Lee complained about how she had handled the criminal and administrative investigations involving Lee.  Ex. I, attached to Pl.'s Concise Statement; Ex. G, attached to Def.'s Motion.  On April 2, 2007, the Senate voted against confirming White.  In May 2007, Governor Lingle appointed Clayton Frank the interim DPS Director.

In September 2007, Lee filed charges with the Equal Employment Opportunity Commission ("EEOC") and the Hawaii Civil Rights Commission alleging that the DPS had discriminated against him because he was male.  Ex. B, attached to Pl.'s Concise Statement.  Lee notes that, on the very day that the EEOC received his charge, DPS investigators questioned him about the alleged 2006 misappropriation.  Lee Decl. ¶ 19; Ex. J, attached to Pl.'s Concise Statement ("My interview with [the DPS] was conducted on September 11, 2007.").

Lee's EEOC charge complained that male ACOs had been singled out for investigation, while four female ACOs with equal access to the equipment and supplies had not been investigated for either criminal or administrative violations.  Ex. B, attached to Pl.'s Concise Statement.  The EEOC, which did not

4

conclude that there had been gender discrimination, issued Lee a
right-to-sue letter on October 22, 2008.  The Hawaii Civil Rights
Commission sent Lee its right-to-sue letter roughly two weeks
later (November 6).  Exs. C & D, attached to Pl.'s Concise
Statement.

A month after Lee had filed charges with the EEOC and
the Hawaii Civil Rights Commission, the Senate held confirmation
hearings on Clayton Frank, Governor Lingle's new nominee to be
the DPS Director.  In October 2007, with his EEOC charge pending,
Lee submitted testimony opposing Frank's confirmation, in part on
the ground that a discrimination suit (not by Lee) against Frank
had cost taxpayers two million dollars.  Ex. J, attached to Pl.'s
Concise Statement; Ex. H, attached to Def.'s Motion.  Lee also
complained in testimony that he should have been returned to his
WCCC position, but that he was instead further investigated
because Frank's executive assistant had alleged that Lee had
misappropriated state funds.  Id.  On October 31, 2007, Frank was
confirmed as the DPS Director.  Also in October 2007, the other
ACOs who were the subjects of the criminal and administrative
investigations were allegedly allowed to return to their original
positions.  Lee Decl. ¶ 20.  It does not appear that anything
more was done concerning the criminal investigation of alleged
misappropriation of DPS resources.

However, independent of the Attorney General, the DPS

continued its administrative investigation of the alleged 2006
misappropriation.  On December 19, 2007, DPS asked Lee to respond
to written questions concerning incidents at WCCC in 2005 and
2006.  The questionnaire asked, among other things, whether Lee
had ever authorized bodywork on state-owned vehicles, and whether
Lee was aware of complaints that other employees had used vulgar
or abusive language to inmates.  Ex. M, attached to Pl.'s Concise
Statement.  It is unclear whether the investigation formally
concluded thereafter, but, in January 2008, it was "re-opened" to
address new allegations.  See Ex. B-7, attached to Def.'s Motion
(referring to "allegations brought to the [Public Safety
Director's] attention by witnesses who were not addressed by the
investigation" and stating that the investigation was "re-opened
to address these issues").

On January 24, 2008, Lee was interviewed by the
Department of the Attorney General "regarding an incident which
occurred on or prior to October 21, 2007, which alleges [Lee]
received confidential information pertinent to an internal
investigation."  Ex. N, attached to Pl.'s Concise Statement.
Apparently, the Attorney General's office was involved because
the DPS "requested the assistance of the Attorney General."  Ex.
B-8, attached to Def.'s Motion.

Also in January 2008, the DPS filled the positions of
Managing ACO for OCCC and WCCC.  Lee had applied for both

6

positions in 2006 and had been interviewed for them in November 2007. Ex. I, attached to Def.'s Motion. In January 2008, the DPS notified Lee that he had not been selected for either position. Ex. J-10, attached to Def.'s Motion.

In February 2008, Lee filled out a follow-up questionnaire regarding the alleged 2006 misappropriation at WCCC. This questionnaire asked, among other things, whether Lee had made inmates clean his yard, whether he had told other employees to service his car at work, and whether he had allowed a trucking company to dump refuse behind the facility. Ex. O, attached to Pl.'s Concise Statement.

In April 2008, Lee filed another EEOC charge, this time alleging that he was being harassed by the DPS investigation. He asserted that the DPS was retaliating against him because of his gender and because he had filed an EEOC charge. Ex. G, attached to Pl.'s Concise Statement. The EEOC again was unable to conclude that any wrongdoing had occurred and sent Lee a right-to-sue letter on October 22, 2008. Ex. B-10, attached to Def.'s Motion.

After reviewing Lee's responses to the December 2007 and February 2008 questionnaires, Frank, the DPS Director, said that additional investigation was needed. Ex. D-5, attached to Def.'s Motion. Frank assigned two investigators who did not know Lee to conduct the further investigation, stating that "it was

7

important to get a different perspective from individuals who did not know [Lee]." Id. Thus, on October 9, 2008, roughly seven months after filling out the last questionnaire, Lee was interviewed regarding the "alleged violation of Department Policy and Procedure that occurred . . . between January 1, 2005 and November 16, 2006 that may have involved preferential treatment by management of various personnel in relation to discipline, assignments, and meal arrangements." Ex. P, attached to Pl.'s Concise Statement.

In July 2009, Lee returned to work at WCCC. Ex. F, attached to Def.'s Motion. On August 18, 2009, a predisciplinary due process hearing determined that there was no reason to impose disciplinary action. Ex. H, attached to Pl.'s Concise Statement.

About seven months before all administrative investigatory actions had concluded, Lee filed the present lawsuit. He alleges that the DPS retaliated against him because he had filed EEOC charges and had testified against individuals nominated to be the DPS Director. The DPS allegedly retaliated against him by subjecting him to a protracted investigation, by failing to select him for the position of Managing ACO, and by reassigning him to a position with lesser duties. He brings a Title VII retaliation claim and a First Amendment retaliation claim. The DPS moves for summary judgment, arguing that Lee has failed to establish such claims.

8

III.      <u>STANDARD OF REVIEW.</u>

One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor."  <u>Miller v. Glenn Miller Prods., Inc.</u>, 454 F.3d 975, 988 (9th Cir. 2006).  (internal quotations and brackets omitted).

Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2) (effective Dec. 1, 2009).  To withstand a properly made and supported motion for summary judgment, the opposing party must set forth evidence showing that there is a genuine issue of material fact in dispute.  Fed. R. Civ. P. 56(e)(2).  However, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Catrett</u>, 477 U.S. at 322.  When the opposing party fails to make such a showing, there is no genuine issue of material fact, as "a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all
other facts immaterial." Id. at 322-23.  In such cases, summary
judgment should be granted.

IV.     ANALYSIS.

        A.   Lee Fails to Establish a Retaliation Claim Because
             He Has Suffered No Adverse Employment Action.

        Lee claims that the DPS retaliated against him in
violation of Title VII of the Civil Rights Act.[1]  Title VII of
the Civil Rights Act of 1964 forbids employment discrimination
based on "race, color, religion, sex, or national origin."  42
U.S.C. § 2000e-2(a).  Title VII's anti-retaliation provision
forbids "discriminat[ion] against" an employee who has opposed
any unlawful employment practice or who has made a charge,
testified, assisted, or participated in a Title VII proceeding or
investigation.  42 U.S.C. § 2000e-3(a).  To establish a prima
facie retaliation claim, a plaintiff must show that he or she
engaged in a protected activity, that he or she was subject to an
adverse employment action, and that there was a causal connection
between the two.  Davis v. Team Elec. Co., 520 F.3d 1080, 1093-94
(9th Cir. 2008); Yartzoff v. Thomas, 809 F.2d 1371, 1375 (9th
Cir. 1987).  If a plaintiff makes out a prima facie case, the
burden shifts to the employer to present legitimate reasons for

---

        [1]Lee also had asserted a retaliation claim in violation of
Hawaii law.  Compl. ¶ 37.  However, the parties stipulated to
dismiss that claim.

the adverse employment action.  Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).  Once an employer carries this burden, a plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by an employer was pretext.  Id.  Only then does the case proceed beyond the summary judgment stage.  Id.

Lee's retaliation claim fails.  An essential element of a retaliation claim is an adverse employment action connected to protected activity that is redressable by the court.  Lee does not establish this element.

1.   The Court Assumes That Lee Engaged in Protected Activity.

The court assumes for purposes of this motion that Lee engaged in protected activity when he testified before the state Senate in the White and Frank confirmation hearings in 2007, and when he filed charges with the EEOC in September 2007 and April 2008.  The DPS does not contest this element for purposes of Lee's retaliation claim.  See Def.'s Mem. Supp. Mot. Summ. J. at 13-15.

2.   Lee Has Not Shown That He Was Subject To Any Adverse Employment Action That This Court May Address.

Lee argues that the DPS retaliated against him (1) when it only investigated male employees, not female employees who had equal access to the allegedly misappropriated materials; (2) when it conducted a three-year investigation in which Lee was

11

repeatedly interviewed and asked to fill out questionnaires while other investigated ACOs were allowed to return to their original positions; (3) when it relegated Lee to a position in which he performed only miscellaneous duties; and (4) when it did not select Lee to fill the position of Managing ACO at OCCC or WCCC. Pl.'s Mem. Opp. Mot. Summ. J. at 16.  Lee argues, "Clearly the Ninth Circuit would recognize 6 investigative interrogations of the same allegations, over a period of 3 years, without any evidence of wrongdoing, and two denied promotions in favor of less experienced and less qualified applicants as adverse actions."[2]  Id. at 18.

The critical issue before this court is whether the DPS investigation(s) constituted an adverse action.  This issue is inherent in the first two forms of alleged retaliation listed above.  This court disregards the third and fourth forms as not properly before this court, as explained further below.

An "adverse employment action" is an action that is "materially adverse" to a reasonable employee or job applicant.

---

[2] Lee says that he was subject to six different investigative interrogations.  However, Lee appears to be including the original criminal investigation conducted by the Attorney General, which Lee does not establish or even argue was attributable to the DPS, the only Defendant here.  When that investigation is removed, the record indicates that Lee was subject to five instances of either being interviewed or having to fill out questionnaires, all relating to DPS investigation(s).  These occurred on September 11, 2007, December 19, 2007, January 24, 2008, February 26, 2008, and October 9, 2008.

<u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006)
(internal quotations omitted).  A plaintiff must show that the
employer's actions are harmful to the point that they could
dissuade a reasonable worker from making or supporting a charge
of discrimination.  <u>Id.</u>  Normally, "petty slights, minor
annoyances, and simple lack of good manners"  will not deter a
reasonable worker from making a charge of discrimination, <u>id.</u>,
while termination, dissemination of a negative employment
reference, issuance of an undeserved performance review, and
refusal to consider a plaintiff for a promotion may dissuade a
worker from making that charge.  <u>Brooks</u>, 229 F.3d at 928-29.

> a.  The Alleged Singling Out of Males for
>     Investigation Was Not an Adverse
>     Employment Action Because The Alleged
>     Singling Out Occurred Before Had Lee
>     <u>Engaged in Any Protected Activity.</u>

To the extent Lee argues that the DPS's alleged
singling out of males for investigation was an adverse employment
action, Lee's argument fails.  Lee is not alleging simple gender
discrimination.  Instead, Lee is alleging that the gender
discrimination was retaliatory.  Thus, Lee's Complaint states,
"Plaintiff engaged in protected speech on matters of public
concern, Plaintiff suffered adverse employment actions, and a
causal link exists between the protected speech and the adverse
employment actions."  Compl. ¶ 34.  Critical to Lee's retaliation
claim is the notion that protected speech led to an adverse

employment action.   But nothing in the record before this court suggests that the DPS decision to investigate only male employees followed, let alone was caused by, any protected speech by Lee.

The DPS first received complaints about Lee and several other male employees in November 2006.   The DPS promptly suspended Lee and others pending completion of the DPS's administrative investigation.   The DPS also referred the matter to the Attorney General's office, which interviewed Lee on November 16, 2006.   In September 2007 and April 2008, Lee filed charges with both the EEOC and the Hawaii Civil Rights Commission.   He testified before the state Senate in March and October 2007.   Lee cannot establish any causal connection between the alleged decision to single out males for investigation and his employment discrimination charges or legislative testimony, as the alleged singling out occurred before he engaged in those activities.

Additionally, the court notes that both the criminal and the administrative investigations stemmed from accusations received by the DPS that certain employees, all of whom happened to be male, had misappropriated materials.   Ex. D, attached to Def.'s Motion.   Because of those complaints, the Attorney General's office conducted a criminal investigation that focused on the conduct of the employees who had allegedly engaged in wrongdoing.   A criminal investigation is not illegally

14

discriminatory because it confines itself to reviewing actions of only those individuals suspected of wrongdoing.[3]   Even if such an investigation might be criticized as too narrow, it is hard to see how it violates Title VII.   In any event, Lee's Complaint does not charge the Attorney General with discrimination.

The DPS conducted an administrative investigation of several ACOs and a number of managers.   Ex. D-4, attached to Def.'s Motion.   To the extent Lee argues that the administrative investigation was discriminatory because it focused on male employees, Lee presents no evidence that all of the managers investigated were male.   Of course, even if everyone investigated was male, the problem remains that the decision as to who would be investigated preceded Lee's protected speech.   Indeed, the DPS suspended the male employees in November 2006 in connection with its investigation.   See Ex. D-4, attached to Def.'s Motion.

b.   The Investigation Itself Was Not An Adverse Employment Action.

Lee argues that the investigation itself constitutes an adverse employment action.   This court does not agree.   Merely

---

[3] Lee points to a telephone interview with White, in which White says that the complainant "did not name any female ACO in his complaint, however, he alleged a female (unsure name, job title) performed duties that she should not have been assigned to do" as support that the investigation should have included females.   However, the complainant was unable to give a name or job title regarding the one female, while providing such information about the other employees.   Ex. D-2, attached to Def.'s Motion.

being subject to an investigation while others are not does not
rise to the level of an adverse employment action for purposes of
Title VII.  See Rademakers v. Scott, No. 09-718, 2009 WL 3459196,
at *4 (M.D. Fla. Jan 22, 2009) ("An investigation into alleged
misconduct is not such adverse employment action and cannot
support [the plaintiff's] retaliation claim."); Mack v. Strauss,
134 F. Supp. 2d 103, 114 (D.D.C. 2001) (noting that, "mere
investigations by plaintiff's employer cannot constitute an
adverse action because they have no adverse effect on plaintiff's
employment").  This court has previously stated that, "[w]hile an
investigation might be undesirable or distasteful, it does not
automatically or necessarily disadvantage an employee." Niimi-
Montalbo v. White, 243 F. Supp. 2d 1109, 1127 (D. Haw. 2003).

        Lee does not demonstrate that he was disadvantaged in
any way that would have deterred a reasonable employee from
filing a charge with the EEOC.  Lee was not subject to any
disciplinary action or reprimand during or as a result of the
investigation.  Lee continued to receive the same salary and
benefits during the investigation.  Ex. K, attached to Def.'s
Motion; Yamamoto Decl. ¶ 13.

        Perhaps recognizing that an investigation is not,
without more, an adverse employment action, Lee focuses on the
number of times he was questioned and the length of the
investigation.  Lee's Concise Statement ¶ 8.  Lee appears to be

16

saying that the DPS investigation was so harassing that it amounted to an adverse employment action.  The record does not support this position.

Lee was first interviewed on November 16, 2006.  This interview was conducted by the Attorney General's office, not the DPS.  Because this first instance occurred before Lee had engaged in any protected activity, this cannot serve as an actionable adverse employment action.

Lee's second interview occurred on September 11, 2007. Lee says that the DPS "retaliated against me when it opened an . . . investigation of me . . . that was previously investigated and closed by Department of the Attorney General."  Lee Decl. ¶ 19.  But Lee presents no evidence that the DPS opened its administrative investigation only after the Attorney General's office had concluded its investigation.  To the contrary, the criminal and administrative investigations appear to have overlapped.  It appears that the administrative investigation began when the ACOs were placed on leave, which happened in November 2006.  Ex. C, attached to Def.'s Motion.

Thereafter, Lee had to fill out questionnaires in December 2007 and February 2008.  Lee complains that these questionnaires were retaliatory because he was repeatedly asked the same questions.  But a review of the questionnaires shows that the same questions were not asked.  See Exs. M & O, attached

17

to Pl.'s Concise Statement.

Lee was also interviewed by an investigator from the Attorney General's office on January 24, 2008.  Lee argues that this interview was an adverse employment action because it focused on his testimony opposing Frank's confirmation.  The investigator allegedly informed Lee that he was "appointed by Frank to investigate the written testimony [Lee] submitted to [the Senate]."  Lee Decl. ¶ 24.  The letter notifying Lee of the interview said that Lee was "under investigation and/or a possible witness."  Ex. N, attached to Pl.'s Concise Statement.  The letter said that the interview would concern how Lee had obtained confidential information pertinent to an internal investigation.  Id.  The letter further explained that the confidential information concerned "the appointment hearing of Clayton Frank" and was "contained in [Lee's] testimony submitted on October 21, 2007."  Id.

Lee fails to raise a triable issue as to whether this interview was an adverse employment action.  Being questioned as a suspect or a witness about information in legislative testimony is not, without more, an adverse employment action.  Lee's testimony contained information about many issues, including the administrative investigation of Lee and others, and the failure of the DPS to return the employees to their original posts.  Ex. J, attached to Pl.'s Concise Statement.  He also testified about

18

an incident involving a female employee who was allegedly
sexually harassed by an off-duty officer.  Id.  Lee was
interviewed in connection with some confidential information he
included in his testimony.  It is unclear whether the
confidential information concerned the sexual harassment of the
female employee, rather than the administrative investigation of
Lee.  In any event, Lee does not indicate that the interview
strayed from the subject of that confidential information, which
was not off-limits simply because he was already under
investigation for other matters.  Lee's position would turn every
inquiry made of a complainant into an adverse employment action.
This is not the law.  Complainants are not immune from
investigation.  Lee fails to raise a genuine issue of material
fact with respect to having suffered an adverse employment action
in the form of this one interview as to how he had obtained
confidential information.

Finally, Lee was interviewed on October 9, 2008.  At
that time, he was allegedly questioned "about false allegations"
for an hour and a half.  Lee Decl. ¶ 28.  By this time, Lee
already had pending his September 2007 and April 2008 charges
with the EEOC.  Those charges obviously did not include a
reference to the subsequent October 2008 interview, and Lee does
not address whether this court may properly consider an alleged
adverse employment action that was not part of the EEOC's

19

administrative process.  Possibly, Lee considers the October 2008
interview to be "like or reasonably related to the allegations
contained in the EEOC charge" and therefore properly the subject
of this lawsuit.  See Green v. Los Angeles Cty. Superintendent of
Schs., 883 F.2d 1472, 1476 (9th Cir. 1989).  In any event, the
record does not support Lee's argument that the October 2008
interview was an adverse employment action.

Lee does not dispute the DPS's contention that the
October 2008 interview was conducted by investigators who did not
know Lee at all and who were not involved with or familiar with
any past investigation of Lee.  Ex. D-5, attached to Def.'s
Motion.  If that unfamiliarity required them to ask Lee questions
about matters covered by earlier interviews, this repetition does
not amount to an adverse employment action.

In short, nothing in the record indicates that the
investigation, either as a whole or broken down into individual
elements, would have dissuaded a reasonable worker from speaking
out.  Lee was interviewed on four occasions and asked to fill out
two questionnaires over a three-year period.  Two of the
interviews were conducted by the Attorney General's office, not
the DPS, and the first preceded any protected speech by Lee and
so could not possibly have been retaliatory.  If that first
interview is disregarded, Lee was interviewed in the fall of 2007
about alleged misappropriation, in early 2008 concerning how he

20

had obtained confidential information, and in the fall of 2008 about what Lee calls "false allegations."  He had to answer different questions in two questionnaires, once in late 2007 and another time in early 2008.  The interviews and questionnaires, whether alone or in combination, simply do not rise to the level of an adverse employment action.  See Lewis v. Conn. Dep't of Corr., 355 F. Supp. 2d 607, 618 (D. Conn. 2005) (noting that an internal investigation that resulted in no discipline was not an adverse employment action); see also Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004) (employee put on paid administrative leave pending the outcome of an internal investigation, who was restored to her position upon the termination of the investigation, suffered no adverse employment action).

> c.   Any Alleged Reduction in Job Responsibility or Authority Was Not An Adverse Employment Action, as the Change in Job Duties Preceded Any Protected Activity.

At the hearing on the present motion, Lee conceded that his mere transfer from WCCC to OCCC was not, by itself, an adverse employment action.  However, he argued that the reduction in his job responsibilities and authority that accompanied the transfer did constitute an adverse employment action.  Lee says that he exercised substantially more authority and power at WCCC than at OCCC, where he says he was assigned clerical tasks.  Lee

21

describes his duties as OCCC as involving "miscellaneous" matters "such as walking around the perimeter of the facility checking fences, sitting at a desk with nothing to do and no responsibilities in order to demean and humiliate me . . . and other clerical duties."  Lee Decl. ¶ 18.

The problem with this argument is one of timing.  Lee was reassigned to OCCC on February 5, 2007.  Ex. E, attached to Def.'s Motion.  Lee submitted testimony to the state Senate in March 2007.  Lee Decl. ¶¶ 14-15.  As Lee does not allege that his duties at OCCC changed after his testimony, he can hardly claim that the duties changed as a result of that testimony.  He filed charges with the EEOC even later, in September 2007 and April 2008.  Absent some evidence that his job duties were reduced in retaliation for either his legislative testimony or his employment discrimination complaints, this court is left with no triable issue relating to a reduction in job duties.

> d.    The DPS's Failure to Promote Lee to a
>        Managing ACO Position at Either WCCC or
>        OCCC Was Not An Adverse Employment
>        Action That This Court May Address.

Lee points to the DPS's decision not to promote him to be a Managing Adult Corrections Officer at either WCCC or OCCC as an adverse employment action.[4]  See Brooks, 229 F.3d at 928-29

_____

[4] Although Lee asserts in his declaration that he also applied for a promotion at the Maui Community Correctional Center and was retaliated against by being denied that promotion, Lee does not appear to be making the denial at MCCC a part of his

(noting that a failure to promote may be an adverse action);
Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d
493, 506 (9th Cir. 2000)(failing to receive a promotion because
the plaintiff engaged in protected activity constitutes an
adverse employment action).  Lee interviewed for both Managing
ACO positions on November 15, 2007, and the DPS filled those
positions in January 2008.  Ex. J, attached to Def.'s Motion.
The problem for Lee, however, is that, having failed to raise any
promotion denial before the EEOC, he cannot proceed with that
matter under Title VII before this court.

        Incidents of discrimination not included in a charge
with the EEOC may not be considered by a court unless the new
claims are "like or reasonably related to the allegations
contained in" a charge.  See Green, 883 F.2d at 1476.  The court
must inquire whether the original EEOC investigation would have
encompassed the additional charges.  For a court determining
whether the claims are reasonably related, "it is appropriate to
consider such factors as the alleged basis of the discrimination,
dates of discriminatory acts specified within the charge,
perpetrators of discrimination named in the charge, and any
locations at which discrimination is alleged to have occurred."

_____

claim in this lawsuit.  That may be because Lee did not actually
apply for the MCC position.  Compare Lee Decl. ¶ 24 and Pl.'s
Mem. Opp. Mot. Summ. J. at 18-19 with Ex. J, attached to Def.'s
Motion (listing Lee as having applied for only the OCCC and WCCC
positions).

Freeman v. Oakland Unified Sch. Dist., 291 F.3d 632, 636 (9th Cir. 2002) (internal quotations omitted).  "The crucial element of a charge of discrimination is the factual statement contained therein."  Id.

The plaintiff in Freeman, a teacher, had filed an EEOC charge alleging discriminatory practices relating to Faculty Advisory Council elections.  Id. at 637.  The plaintiff alleged that he was thereafter retaliated against by being required to teach more students than the contract agreement allowed, while other teachers taught the prescribed number of students.  Id. at 635 n.4.  The Ninth Circuit held that the scope of the EEOC investigation would not have focused on anything beyond Freeman's participation in the Faculty Advisory Council and its election process.  Id. at 637.  Thus, the federal court could not consider Freeman's allegations of discrimination relating to class size.

Similarly, Lee filed charges with the EEOC that made no mention of the DPS's failure to promote him to be a Managing ACO.  In Lee's first EEOC complaint, filed before the DPS even interviewed for the Managing ACO positions, Lee only complained that male "ACOs and myself were singled out by the Department of Public Safety" and that no action was taken against four female employees who had access to the materials.  Ex. A, attached to Def.'s Motion.  A reasonable investigation by the EEOC would not have focused on anything beyond gender discrimination.  At most,

the EEOC might have examined the investigation itself.  Lee gave the EEOC no reason to investigate the DPS's hiring process, which began two months after Lee filed a charge with the EEOC.

The charge Lee filed with the EEOC in April 2008, three months after Lee was told that he had not been promoted, made no mention of the promotion denial.  Lee only said, "I believe that I have been subjected to retaliation because of my sex (male) and for previously filing an EEOC charge of discrimination."  Ex. B-5, attached to Def.'s Motion.  He described the retaliation as taking the form of a prolonged investigation and questionnaires, and complained that the investigation constituted harassment. Id.

At the hearing on the present motion, this court asked Lee where, before filing this lawsuit, Lee had alleged that the DPS's failure to select him as a Managing ACO constituted retaliation or discrimination.  Lee's counsel was unable to find any evidence of such allegation.

Lee is without any basis for a claim of employment discrimination in violation of Title VII.

B.    Lee's First Amendment Claim Fails.

A First Amendment retaliation claim against a government employer involves a sequential five-step series of questions: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or

public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech. Desrochers v. City of San Bernadino, 572 F.3d 703, 708 (9th Cir. 2009)(quoting Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009)).

A plaintiff has the burden of showing that he or she satisfies the first three of the five steps.  Because these are sequential steps, a plaintiff's failure to prove any of the first three steps "necessarily concludes [this court's] inquiry." Huppert v. City of Pittsburg, 574 F.3d 696, 703 (9th Cir. 2009). If the plaintiff meets that burden, the government has the burden of establishing the fourth element, or, failing that, the fifth element.  Eng, 552 F.3d at 1070-72.  While Lee clearly satisfies the first element (speaking on a matter of public concern) as well as the second element (speaking as a private citizen), he in no way carries his burden as to the third element (showing that he suffered an adverse employment action and that his protected speech was a substantial or motivating factor for that action).[5]

_____

[5]Lee also alleges that the DPS violated rights conferred by Article 1, section 4, of the Hawaii constitution.  However, the free speech rights conferred by the Hawaii constitution are

26

1.   Lee Spoke About Matters of Public Concern.

Lee contends that he spoke about matters of public concern when he submitted testimony in opposition to White's confirmation as DPS Director in March 2007, and when he submitted written testimony in opposition to Frank's confirmation as DPS Director in October 2007.  Pl.'s Mem. Opp. Mot. Summ. J. at 20. The DPS argues that Lee's testimony concerned only "individual disputes and grievances," not matters of public concern. Construing the issue in the light most favorable to Lee, the court concludes that Lee testified about matters of public concern.

Speech that addresses matters of "legitimate public concern" is protected under the First Amendment.  Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003).  Matters of public concern are matters about "which information is needed or

---

identical to those conferred by the First Amendment to the United States Constitution.  See In re Doe, 76 Haw. 85, 94 n.16, 869 P.2d 1304, 1313 n.16 (1994) ("The rights specified in this section, virtually unchanged since statehood, are often referred to as 'first amendment rights' because they are identical to those found in the [f]irst [a]mendment to the [United States] Constitution.") (quoting A.F. Lee, The Hawaii Constitution 37 (1993)); see also Estes v. Kapiolani Women's & Children's Med. Ctr., 71 Haw. 190, 195, 787 P.2d 216, 220 (1990) (language of Hawaii constitution is nearly identical to the First Amendment, making application of federal cases construing First Amendment rights appropriate).  Lee gives the court no reason to interpret the Hawaii constitution more broadly than the United States Constitution.  The court therefore does not separately analyze the state constitutional claim, intending instead that its analysis of the federal claim apply to the state claim.

appropriate to enable members of society to make informed

decisions about the operation of their government." Id.

(internal quotations omitted).  In contrast, speech regarding

"individual personnel disputes and grievances" that is irrelevant

to the public's evaluation of governmental agencies does not

address matters of public concern.  Id.  The distinction is often

difficult to draw.  For example, while the efficiency of a

government agency might be seen as a matter of public concern,

the Ninth Circuit notes that not all speech concerning government

inefficiency is protected.  Desrochers, 572 F.3d at 711.  The

court must adopt a "liberal construction of what an issue 'of

public concern' is under the First Amendment."  Id. at 710

(quoting Roe v. City & County of S.F., 109 F.3d 578, 586 (9th

Cir. 1997)).  The public concern inquiry is purely a question of

law, Eng, 552 F.3d at 1070, and the court must review the

"content, form, and context" of the speech when making this

inquiry.  Desrochers, 572 F.3d at 709.

        Analyzing the content, the court must consider whether

at least a small segment of the general public could be "truly

interested" in the content of the speech, or whether the content

concerns a private grievance.  Roe, 109 F.3d at 585.  Lee

primarily testified about the investigation by the DPS and the

Attorney General of alleged misappropriation.  Lee further

testified that White "[had] not do[ne] her homework" and had

dealt poorly with employee transfers.  Doc. No. 173 under Ex. I,
attached to Pl.'s Concise Statement.  Lee said that White had
created stress and had "jeopardize[d] the good government and
morale of WCCC."  Id.  In October 2007, Lee testified about a
sexual harassment incident in which a male employee allegedly
physically restrained a female employee and "ripp[ed] the female
officer's uniform shirt completely off her back."  Doc. No. 159
under Ex. J, attached to Pl.'s Concise Statement.  In sum, Lee
described alleged incidences of gender discrimination and
improper treatment by a government agency.  Such matters would
likely be of interest to at least some members of the general
public.  See Desrochers, 572 F.3d at 712 (noting that
descriptions of botched investigations or of poor performance may
address matters of public concern).

        Turning to the form of Lee's speech, the court notes
that Lee publicly disclosed the information in testimony before
the Senate.  Although whether the information is disclosed
publicly rather than privately is not dispositive, Garcetti v.
Ceballos, 547 U.S. 410, 420 (2006), a limited audience weighs
against a finding of public speech.  Desrochers, 572 F.3d at 714.
As Lee's speech took the form of testimony disseminated to the
public, this portion of the test weighs toward a holding that his
speech addressed a matter of public concern.  Id.  Legislative
testimony by its nature involves a subject that a legislative

body has invited comment on in aid of deciding what legislative action to take.  Such speech has a high likelihood of involving a matter of public concern.

Finally, in analyzing the context, the court must examine the "point" of the speech.  Desrochers, 572 F.3d at 715. Does the speech "seek to bring to light actual or potential wrongdoing or breach of public trust, or is it animated instead by 'dissatisfaction' with one's employment situation?"  Id. (quoting Connick v. Myers, 461 U.S. 138, 148, 103 S. Ct. 1684, 1691 (1983); Roth v. Veterans Admin. of Gov't of the United States, 856 F.2d 1401, 1405 (9th Cir. 1988)).

The DPS contends that Lee's testimony did not address matters of public concern but was instead motivated by his employment situation.  Lee had been criminally investigated and was under an administrative investigation at the time of his testimony.  His name had been in the paper and he had been transferred to OCCC, where he alleges that he performed demeaning tasks.  The DPS questions whether Lee testified primarily "for the good of the department" or out of anger with the investigation and transfer.  Lee testified that White was "stonewalling the investigation," Ex. I, attached to Pl.'s Concise Statement, and that the allegations against Lee showed that the DPS Director had been "dampen[ed] by lies, greed, and selfishness."  Ex. J, attached to Pl.'s Concise Statement.  If

30

Lee's speech was "precipitated by adverse actions of [his] supervisors pertaining to [his] employment," that weighs against a determination that his speech involved a matter of public concern.  See Roth, 856 F.2d at 1405.

However, construing the evidence in the light most favorable to Lee and balancing all factors, the court concludes that Lee spoke on a matter of public concern.

2.   Lee Spoke as a Private Citizen.

The second question in the sequential five-step series of questions is whether Lee spoke as a private citizen or as a public employee.  To proceed, Lee must establish that he spoke in the capacity of a private citizen.  Garcetti v. Ceballos, 547 U.S. 410, 421-22 (2006); Eng, 552 F.3d at 1071.

Lee spoke as a private citizen if he had no official duty to make the statements in issue, or if he did not speak as part of what he was paid to do.  See Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008).  The question of the capacity in which Lee testified before the state Senate is a mixed question of fact and law.  Id. at 1129.  But no facts relating to that issue are in dispute.  Lee clearly had no official duty to speak out against Governor Lingle's nominee for DPS Director.  See Freitag v. Avers, 468 F.3d 528, 545 (9th Cir. 2006) (noting that a female prison guard spoke as a citizen when she communicated with her state senator and an inspector general

31

about the state's alleged failure to eliminate sexual
harassment).  If DPS employees had such a duty, then presumably
every DPS employee would have been required to testify before the
state Senate, which would have made the Senate confirmation
hearing unbearably lengthy.  Nothing in the record before this
court suggests that such was the case.  Nor is the DPS contending
that Lee's job compensation included providing testimony about a
nominee.  To the contrary, the DPS expressed concern that Lee's
testimony had revealed confidential information, and Lee was
investigated as to how he had acquired such information.  Under
these circumstances, the court concludes, applying <u>Garcetti</u> and
<u>Posey</u>, that Lee spoke as a private citizen.

        3.    Lee Has Not Established That He Was Subject
            To An Adverse Employment Action That Was
            <u>Substantially Motivated by His Speech.</u>

In the third step of the sequential five-step inquiry,
a plaintiff must show that the government took an "adverse
employment action" and that the plaintiff's speech was a
"substantial or motivating factor" in the adverse action.  <u>Eng</u>,
552 F.3d at 1071.  As noted above in the discussion of Lee's
employment discrimination claim, and as both parties argue, an
adverse employment action is one that is "reasonably likely to
deter" an employee from engaging in constitutionally protected
speech.  <u>Coszalter</u>, 320 F.3d at 976.

Lee points to two alleged adverse employment actions.

32

First, he says the DPS's lengthy investigation of him, involving multiple interviews and two questionnaires, was an adverse employment action.  Second, he says the denial of a promotion to Managing ACO at OCCC or WCCC was an adverse employment action. This court concludes that neither action satisfies Lee's burden with respect to his First Amendment retaliation claim.

> a.    The Investigation Does Not Satisfy
>       Lee's Burden on The Third Inquiry.

Lee argues that the DPS's three-year investigation resulting in no finding of wrongdoing constitutes an adverse employment action that was substantially motivated by his protected speech.  In general, an "unwarranted disciplinary investigation," combined with other retaliatory measures, may constitute an adverse employment action under the First Amendment.  Coszalter, 320 F.3d at 976 (holding that "some, perhaps all, of the following acts, considered individually, were adverse employment actions for purposes of plaintiffs' First Amendment retaliation suit: . . . an unwarranted disciplinary investigation . . . and two consecutive ninety-day 'special' reviews of work quality"); Ulrich v. City & Cty. of San Francisco, 308 F.3d 968, 977 (9th Cir. 2002) (holding that the plaintiff had been subjected to more than trivial adverse employment actions when the defendant "subjected him to an investigation that threatened to revoke his clinical privileges" in addition to refusing to accept his revocation of resignation).

33

However, at the same time, managers have investigatory discretion
under the First Amendment.  See Waters v. Churchill, 511 U.S.
661, 678 (1994).  As noted by the Supreme Court in Churchill,

> [T]here will often be situations in which
> reasonable employers would disagree about who
> is to be believed, or how much investigation
> needs to be done, or how much evidence is
> needed to come to a particular conclusion.
> In those situations, many different courses
> of action will necessarily be reasonable.
> Only procedures outside the range of what a
> reasonable manager would use may be condemned
> as unreasonable.

A three-year investigation involving several interviews
and questionnaires is not necessarily unwarranted.  While Lee
argues that the three years of "trying to pin wrongdoing on
[Lee], and being unsuccessful, shows [the DPS's] dogged intent to
retaliate," Pl.'s Mem. Opp. Mot. Summ. J. at 25, there is no
actual evidence that any investigator "tried to pin any
wrongdoing" on Lee.  Being interviewed several times and filling
out more than one questionnaire is not, without more, reasonably
likely to deter protected speech.  See Coszalter, 320 F.3d at
976.  Lee does not show more.

Lee kept his rank, his seniority, his pay, and his
benefits throughout the investigation.  He tries to establish
retaliation by contrasting his circumstance with that of another
employee who was arrested and charged with violating other
federal and state laws but allowed to continue to work in his
assigned position, and yet another employee who had fraternized

34

with an inmate but who continued to work in the facility where the inmate was held until the investigation ended, resulting in the employee's termination. Lee Decl. ¶ 31. It is not at all clear that Lee has personal knowledge about those other employees, whose alleged wrongdoing had nothing to do with Lee. Even assuming the court may consider Lee's descriptions of those employees' circumstances, those descriptions are so brief that they do not allow the court to evaluate whether Lee had an analogous situation or that Lee suffered retaliation. The court cannot determine whether the DPS had legitimate reasons for continuing those other employees in their positions. Even if the DPS had no legitimate reason to do that, it does not necessarily follow that Lee was retaliated against. For example, it might be that the investigations of those other employees were flawed, rather than that Lee was subjected to retaliation. And Lee says nothing about what job duties those other employees had while being investigated. It might be that those other employees, even while remaining at their assigned facilities, were given reduced authority, just as Lee says he was when transferred to OCCC. The burden is on Lee to establish an adverse employment action motivated by his speech, and he does not do that by pointing only to multiple interviews, two questionnaires, and other employees whose situations are so undefined as to constitute no comparison to Lee himself.

35

The timing of Lee's speech also undermines Lee's contention that the investigation constituted an adverse employment action.  The investigation began four months before Lee testified in the first confirmation hearing.  Lee presents no evidence that the scope, extent, or intensity of the investigation increased after Lee engaged in such protected activity.  Lee asks this court to infer that the DPS dragged the investigation out over a three-year period in retaliation for his testimony, but Lee provides no evidence on which the court may base such an inference.  Nothing suggests that the investigation was "outside the range" of what a reasonable employer would have done under the circumstances.  The court concludes that Lee fails to meet his burden of establishing that the investigation was unwarranted.  <u>Churchill</u>, 511 U.S. at 678.

> b.   The Promotion Denial Does Not Satisfy
>      Lee's Burden on the Third Inquiry.

Lee attempts to bolster his complaint about the lengthy investigation with his argument that he was denied a promotion in retaliation for his protected speech.  Whether alone or in combination with each other, the investigation and the promotion denial do not satisfy the third inquiry of a First Amendment retaliation claim.

Lee says that his legislative testimony in March and October 2007 was a motivating factor in the DPS decision not to select him as a Managing ACO in January 2008.  Lee claims to have

36

had better qualifications and experience than the individuals who
were selected.  The DPS says that Lee was not selected because
his credentials were not as good as the selected persons'
credentials and because he performed poorly in his interview.

A plaintiff first must submit evidence that his or her
employer knew of the protected speech.  Once the defendant's
knowledge is shown, a plaintiff may circumstantially show a
retaliatory motive by showing either (1) that there is proximity
in time between the speech and retaliatory actions; (2) that the
defendant expressed opposition to the speech; or (3) that the
defendant's proffered explanations for the adverse actions were
false and pretextual.  Alpha Energy Savers, Inc. v. Hansen, 381
F.3d 917, 927 (9th Cir. 2004); Keyser v. Sacramento City Unified
Sch. Dist., 265 F.3d 741, 751-52 (9th Cir. 2001).  Although this
motive element of a First Amendment retaliation claim usually
involves questions of fact that normally should be left for
trial, when there is no factual issue, summary judgment may be
granted.  Ulrich, 308 F.3d at 979.

First, it is not clear that all the interviewers or
decision-makers were aware that Lee had testified before the
state Senate.  One of the three panelists who interviewed Lee in
November 2008 was present when Lee testified in March 2007.  Lee
Decl. ¶ 15.  There is no evidence that this individual
communicated this to the other panelists or that the other

panelists had independent knowledge of Lee's testimony.

Lee also argues that "Defendant was aware that [Lee] opposed the confirmation of [Frank] because in a letter . . . Defendant instructed me that I was [to be interviewed regarding testimony Lee submitted to the Senate]." Lee Decl. ¶ 17. However, that letter was signed by Donald K.L. W, Chief Investigator. See Ex. N, attached to Pl.'s Concise Statement. There is no evidence that this investigator was involved in the selection process. Additionally, the DPS presents evidence that Frank, whom Lee had testified against, did not participate at all in the interview process. Johnson Decl. ¶ 7, attached to Def.'s Motion ("Frank did not participate at all in the initial interviews of the applicants for the [OCCC and WCCC position].").

Even if the panelists and the decision-makers knew of Lee's protected speech, that alone would not satisfy Lee's burden. Lee would still have to present some evidence tending to show that his speech was a substantial or motivating factor in the DPS's decision not to select him. In that regard, Lee says only that he was more qualified than the individuals selected. Pl.'s Mem. Opp. Mot. Summ. J. at 19. Lee argues that the applicants selected had less experience than he did, and that one was employed as a bouncer at a strip club that was owned by an inmate. Lee Decl. ¶¶ 22, 23.

The DPS notes that Lee did not have a college

education.  Yamamoto Suppl. Decl. ¶ 10, attached to Def.'s Reply.
The minimum qualifications for the Managing ACO position included
a bachelor's degree from "an accredited university with either a
major, or a sufficient number of credit hours in appropriate
subjects which would satisfy academic requirements for a major."
An applicant could substitute work experience that "provided
knowledge, skills and abilities comparable to those acquired in
four years of successful study . . . on a year-for-year basis,"
provided the work experience was "of such scope, level and
quality so as to assure the possession of comparable knowledge,
skill and abilities."  Ex. I, attached to Def.'s Motion.  The
education or experience background had to include "demonstrated
ability to write reports, read and interpret complex written
material, speak effectively and persuasively."  Id.

       Lee's application did not indicate that he had a
bachelor's degree or enough credits to satisfy the academic
requirements for any major.  Ex. I-7, attached to Def.'s Motion.
Both the individuals selected listed college degrees.  Yamamoto
Decl. ¶¶ 3-7; Exs. L & M, attached to Def.'s Reply.  Neither in
his application nor in his opposition to the present summary
judgment motion does Lee show how his work experience provided
knowledge, skills, and abilities comparable to those acquired in
four years of college, on a year-for-year basis.  At most, Lee
notes that he had served as an Acting Warden for one year.  Pl.'s

Mem. Opp. Mot. Summ. J. at 16.  However, the individual selected for the OCCC position was an "ACO V" from 1984 until the time of application (in 2007) and had been an Acting Warden from 2005. Ex. L, attached to Def.'s Reply.  The individual selected for the WCCC position had become an Acting Warden in 2007.  Ex. M, attached to Def.'s Reply.  Thus, Lee's one year of experience as an Acting Warden does not appear to have trumped the combination of the chosen applicants' experience as Acting Wardens and education.  The application form specifically stated that the "possession of the required amount of experience will not in itself be accepted as proof of qualification."  Ex. I, attached to Def.'s Motion.

Lee also argues that he had worked in the DPS for a longer time than the chosen applicants.  However, the chosen applicants did have significant experience in the DPS, and mere longevity does not necessarily make one better qualified. Without details as to how those extra years at the DPS made him better qualified, Lee does not carry his burden of showing that the DPS failed to select him for a Managing ACO position because of his legislative testimony.

Notably, Lee received a lower score on his interview than the chosen applicants.  The panel gave him a score of 50%. Ex. J, attached to Def.'s Motion.  The candidate selected to be the Managing ACO at OCCC scored 94%, while the candidate selected

40

for WCCC scored 74%.  Id.  This court recognizes that an
interview score may well be heavily subjective, and that this is
an area where retaliation against an applicant may be disguised.
But Lee makes no argument that he performed better than his
score.  While the court understands that Lee could not have been
present at his competitors' interviews, he certainly could have
taken discovery about how they performed at their interviews and
about how they and he were scored.  His failure to present any
evidence raising questions about the interview scores makes it
difficult for him to maintain that he was denied a promotion on
illegitimate grounds.

Lee has the burden of establishing at least a question
of fact as to whether he was denied a promotion because of his
testimony.  Lee presents no evidence that his experience was
equivalent to a college degree, that his many years at the DPS
provided him with not just seniority but better managerial skills
than his competitors had, or that his interview score was
unwarranted.  Lee leaves the court with no evidence suggesting
any pretext by the DPS in its promotion decisions.  In the face
of the paucity of evidence that Lee's protected speech was a
substantial or motivating factor in the DPS's decision not to
promote him, this court concludes that Lee does not meet his
burden as to the third inquiry.  As Lee does not indicate how,
having failed in this regard on the present motion, he could

41

somehow meet his burden at trial, the present failing is fatal to Lee's First Amendment retaliation claim.  The court therefore does not analyze the remaining inquiries of a First Amendment retaliation claim.

V.      CONCLUSION.

        The DPS's motion for summary judgment is granted.  The Clerk of Court is ordered to enter judgment for Defendant and to close the case.

        IT IS SO ORDERED.

        DATED: Honolulu, Hawaii, January 20, 2010



                        /s/ Susan Oki Mollway

                        Susan Oki Mollway
                        Chief United States District Judge

Lee v. State of Hawaii, et al., Civ. No. 09-00032, SOM/KSC Order Granting Defendant's Motion for Summary Judgment.

42